```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                    EASTERN DIVISION
```

**JANET L. BENDER,**

        **Plaintiff,**

  vs.                                 **Civil Action 2:10-CV-772**
                                                **Judge Frost**
                                                **Magistrate Judge King**

**MICHAEL J. ASTRUE, Commissioner**
**of Social Security,**

        **Defendant.**

## REPORT AND RECOMMENDATION

### I.
### Introduction and Background

      This is an action instituted under the provisions of 42 U.S.C. §§405(g), 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying plaintiff's applications for disability insurance benefits and supplemental security income. This matter is now before the Court on plaintiff's *Statement of Errors*, Doc. No. 11, and the Commissioner's *Memorandum in Opposition*, Doc. No. 15.

      Plaintiff Janet L. Bender filed her current applications for benefits on April 23, 2004, alleging that she has been disabled since September 30, 2002, as a result of peripheral vascular disease, asthma and hypertension.[1] *A.R.* 67-69, 769-71; 121. The applications were denied initially and upon reconsideration, and plaintiff requested a *de novo* hearing before an administrative law judge.

      Administrative hearings were held on August 16, 2007 and July 2, 2008, at which plaintiff, represented by counsel, appeared

---

[1] Plaintiff filed prior applications for benefits in March 2003. Those applications were denied in December 2003. A.R. 45, 48-53, 70-72, 765-67. Plaintiff did not, apparently, seek further review of that decision.

and testified. A.R. 888-918, 919-43.  Charlotta J. Ewers testified as a vocational expert at the second hearing.[2]  In a decision dated August 29, 2008, the administrative law judge denied plaintiff's applications based on his conclusion that plaintiff's impairments do not constitute a "disability" within the meaning of the Social Security Act. *A.R.* 19-31. That decision became the final decision of the Commissioner of Social Security when the Appeals Council declined review on June 29, 2010. *A.R.* 7-10.

Plaintiff was 47 years of age at the time the administrative law judge issued his decision. She has a high school education and some college.  She has prior relevant work experience as a driver, fleet service agent and cashier. *A.R.* 29, 78, 83.

Plaintiff testified at the administrative hearings that she quit work, on her doctors' advice, because of adverse side-effects of her medication and because she cannot use her left hand or arm. A.R. 892, 895-96. She suffers from peripheral vascular disease, which causes numbness of the legs with prolonged sitting, standing and walking. A.R. 897. Plaintiff also complained of pain in her legs and hips, A.R. 898, and in her lower back, A.R. 927. She sometimes uses a cane, but prefers not to do so; instead, she leans on something, such as a shopping cart. *Id.* Asthma causes shortness of breath with exertion. A.R. 900. She underwent carotid bypass surgery and, since that time, has suffered constant pain in the left shoulder.  A.R. 902. Her pain medication helps while at rest but not if she is on her feet. A.R. 905. Her blood pressure medication makes her drowsy. A.R. 899. She becomes dizzy up to five times a day for a few minutes at a time. A.R. 904.  She denied psychological or emotional problems. A.R. 902.

---

[2] Because the alleged errors raised by plaintiff do not implicate the vocational expert testimony also presented at the administrative hearing, the Court has not summarized that testimony.

Plaintiff testified that she drives only occasionally because of the drowsiness and dizziness caused by her medications. A.R. 893-94.

Plaintiff estimated that she can walk less than half a block because of pain in her legs and can stand only 15 to 20 minutes at a time because of pain in her legs and hips. A.R. 907. She can sit for 15 to 30 minutes, depending on whether the chair is cushioned. *Id.*  She can lift 10 pounds. A.R. 908. She can climb stairs only with difficulty.  She can use her fingers, hands and arms without difficulty. A.R. 907.

On a typical day, plaintiff testified, she spends 8 to 10 hours a day lying down, A.R. 912, and about 14 hours a day sleeping, A.R. 913. She cooks only in the microwave, and does not sweep, mop or vacuum. A.R. 908-09. Her sister helps with grocery shopping. A.R. 909.

## II.

### The Medical Evidence of Record.

In January 2001, stents were placed in plaintiff's iliac (renal) arteries to address narrowing and plaque build-up. *A.R.* 182-84. A March 2001 heart catheterization showed a "normal" ejection fraction of 58%. *A.R.* 363-64. In September of that year, plaintiff underwent an angiography and angioplasty with stent implantation in both iliac arteries.  *A.R.* 193-95.

Plaintiff first saw thoracic surgeon Manucher Fallahnejad, M.D., on October 5, 2001. *A.R.* 388. Plaintiff denied difficulty performing activities of daily living. Although she was working, she expressed concern about continuing to do so. Dr. Fallahnejad noted good results from the angioplasty but recommended close follow-up. *Id.* He also suggested smoking cessation. *Id.*

In November 2001, Dr. Fallahnejad noted "a significant progression of her symptoms." *A.R.* 387. Plaintiff reported that she could not walk or work and complained of a burning sensation and

pain in her leg. *Id.* Another stent was placed in the left leg in December 2001. *A.R.* 190-91. In March 2002, plaintiff reported to Dr. Fallahnejad that she was able to "carry on her daily living activities without any difficulty." *A.R.* 386. Dr. Fallahnejad characterized plaintiff's condition as stable; treatment was conservative. *Id.* In May 2002, plaintiff reported that she was "somewhat improved" since her stent surgery and was "able to cope with her daily living activities without any problems." *A.R.* 385. However, she had not been very active in recent weeks because of back problems stemming from a separate accident. *Id.* In September 2002, plaintiff reported recent deterioration of her leg symptoms, including difficulty walking distances. *A.R.* 384. On clinical examination, Dr. Fallahnejad noted that plaintiff's left leg was cooler than the right, the left femoral pulse was absent, and the Doppler indicated a weak signal. *Id.* An October 2002 abdominal aortogram and bilateral lower extremity arteriogram showed severe distal aortic proximal common iliac artery atheromatous disease with extensive bilateral common iliac artery stents, and evidence of right stenosis involving the mid common iliac artery and the proximal external iliac artery. *A.R.* 197-99. Plaintiff underwent angioplasty with stenting. *Id.*

A March 2003 MRA of the head was suggestive of occlusion of the left vertebral artery. *A.R.* 230. In April, plaintiff complained to Dr. Fallahnejad of significant dizziness, lightheadedness and near syncope. *A.R.* 382. Since her most recent angioplasty, she was "more functional than before" and was "able to carry on her daily activities without problem." *Id*. Dr. Fallahnejad's examination noted loud bruit audible in the left carotid and in the juxtaclavicular area of the subclavian artery, weaker femoral pulse on the left, coolness of the left foot, and barely perceptible lateral malleolar pulse. *A.R.* 383. Dr. Fallahnejad also noted that plaintiff continued to smoke. *Id.*

4

An MRA of the carotids performed in April 2003 showed severe stenosis at the proximal left subclavian artery with approximately 75% narrowing of the vessel and a hypoplastic left vertebral artery. *A.R.* 228-29. On April 28, 2003, Dr. Fallahnejad diagnosed vertebral basilar insufficiency and recommended continued conservative treatment. *A.R.* 378.

In May 2003, Dr. Fallahnejad reported a history of diffuse atherosclerosis and chronic cigarette abuse. *A.R.* 375. Clinical findings included evidence of occlusive arterial disease involving the aorto iliac and femoral popliteal artery, and lumbar syndrome. *Id.* According to Dr. Fallahnejad, plaintiff could lift up to fifteen pounds, could stand or walk up to six hours out of eight, could sit without limitation and could push or pull up to twenty pounds. *A.R.* 375-77.

Dara G. Jamieson, M.D., a neurologist, examined plaintiff in May 2003. *A.R.* 422-23. Plaintiff reported lightheadedness and episodic dizziness. She also complained of numbness of the left arm while picking up objects. Plaintiff also reported blurring of the left eye with reading and watching television. *Id.* Examination revealed loud left subclavian bruits and decreased left brachial and radial pulses. Her gait was normal, as was sensory and motor exam. *A.R.* 423. Dr. Jamieson diagnosed left subclavian artery stenosis with steal phenomenon and commented that plaintiff "should not be working." *A.R.* 423. Dr. Jamieson referred plaintiff to a vascular surgeon. *Id.*

An MRI of the brain performed on May 12, 2003 showed several scattered foci of hyperintensity within the right frontal subcortical white matter. *A.R.* 506-07.

Plaintiff presented to the emergency room that same month with complaints of chest pain. *A.R.* 213-27. Examination revealed reduced pulses in the left arm. *A.R.* 220.

On May 11, 2003, plaintiff began treatment with Keith Calligaro, M.D., the vascular surgeon to whom Dr. Jamieson had referred her. *A.R.* 440. Plaintiff complained of dizzy spells and left arm numbness when raising her arm. *Id.* Examination revealed left supraclavicular bruit, very weak femoral and popliteal pulses and slightly stronger dorsalis pedis pulses, and no palpable left brachial, radial, or ulnar pulse. *A.R.* 440-41. Dr. Calligaro reported that a scan indicated stenosis in plaintiff's left carotid artery as well as severe stenosis of a left pelvic artery. *A.R.* 438-39. On June 24, 2003, plaintiff underwent bypass of the left common carotid artery to subclavian artery. *A.R.* 246-48.

A July 2003 MRA of the aorta and neck showed status-post left carotid/subclavian bypass with antegrade flow seen in the left vertebral artery and increased caliber of the left vertebral. *A.R.* 416-17.  An August 2003 CT scan of the neck showed mild postoperative changes within the left anterior neck. *A.R.* 495-496.

Steven Klein, D.O., evaluated plaintiff on behalf of the state agency on October 1, 2003. Based on his evaluation, Dr. Klein diagnosed hypertension, gait disturbance favoring the left leg due to peripheral vascular disease, chronic obstructive pulmonary disease, history of corrective surgery for blocked arteries and left upper extremity grip weakness. Dr. Klein described plaintiff's peripheral vascular disease as "extremely severe." *A.R.* 392-400.

After a November 2003 review of the file, state agency physician  Naphtali A. Britman, M.D., opined that plaintiff could lift ten pounds, could stand or walk for about two hours in an 8-hour workday, could sit for about six hours in a work day, was limited in her ability to push or pull with her left arm due to diminished grip strength, could frequently stoop and kneel, could occasionally crouch, crawl, balance and climb ramps and stairs, could never climb ladders, ropes or scaffolds, could occasionally handle objects with her left hand, could not tolerate even moderate

exposure to respiratory irritants or concentrated exposure to extreme temperatures, wetness or humidity. *A.R.* 403-09.

A November 2003 MRI of plaintiff's left shoulder revealed tendinopathy of the infraspinatous tendon. *A.R.* 484.

Plaintiff's treating vascular surgeon, Dr. Calligaro, reported to Dr. Jamieson in January 2004 that plaintiff was doing well other than intermittent numbness in both upper arms, for which no cause could be found. Dr. Calligaro was "delighted" that plaintiff was "doing well." *A.R.* 424.

Robert Brandt, M.D., a family practice specialist with Health Care Interventions, became plaintiff's primary care provider in June 2004. *A.R.* 557. Plaintiff complained of hip pain and dizziness. In October 2005, Dr. Brandt urged plaintiff to "Walk!" *A.R.* 638. Dr. Brandt referred plaintiff to cardiac and vascular specialists. *A.R.* 555.

Damian I. Lebanoff, M.D., a vascular specialist, saw plaintiff in September 2004 and concluded that plaintiff's leg complaints "are not related to peripheral arterial occlusive disease." *A.R.* 596. An arterial flow study in September was normal, with no evidence of arterial insufficiency in either leg. *A.R.* 601.

In October 2004, plaintiff saw sleep specialist Dharmesh Gandhi, M.D., for complaints of snoring and daytime sleepiness. *A.R.* 610-11. Based upon a sleep study, Dr. Gandhi diagnosed obstructive sleep apnea, *A.R.* 607, and prescribed a CPAP machine, *A.R.* 606. In May 2005, Dr. Ghandi increased the CPAP pressure to address complaints of tiredness. *A.R.* 604. In November 2005, plaintiff reported no daytime sleepiness or tiredness. *A.R.* 603. In September 2006, plaintiff reported being "much more awake and energetic" with CPAP treatment. *A.R.* 672.

In December 2004, state agency reviewing physician Gary W. Hinzman, M.D., opined that plaintiff could lift ten pounds occasionally, could stand or walk for at least two hours in an 8-

hour workday, could sit for about six hours in a work day. Her ability to push or pull with her arms was limited; she could frequently climb ramps and stairs, could only occasionally stoop, kneel, crouch and crawl, and could never climb ladders, ropes or scaffolds. She could only occasionally engage in gross manipulation handling with the left upper arm because of weak grip strength associated with the bypass procedure. She could not work in concentrated exposure to temperature extremes and environmental irritants. *A.R.* 565-72.

Damian M. Danopulos, M.D., performed a lower arterial Doppler and limited examination for the state agency in December 2004, *A.R.* 575-88, and concluded that the results were normal for plaintiff's right leg and showed a mild obstruction for the left leg. *A.R.* 575-76. He found no evidence of congestive heart failure. *A.R.* 580. He noted mild emphysema without a restrictive component. *A.R.* 580, 583-84.

In February 2005, B. K. Srivastava, M.D., a cardiologist, reported to Dr. Brandt that recent testing showed no cardiac abnormalities. *A.R.* 621. She continued to do "extremely well from a cardiovascular point of view" in August 2005. *A.R.* 620. Plaintiff complained to Dr. Srivastava of rapid heartbeat in February 2006, *A.R.* 764, but in March 2006 Dr. Srivastava noted that investigation had not revealed any sustained abnormalities. *A.R.* 761, 764. The cardiologist decreased plaintiff's medication. *Id.* Dr. Srivastava's primary diagnosis in August 2006 was mild nonobstructive coronary artery disease, stable. *A.R.* 671.

An April 2005 EMG revealed findings consistent with early mild peripheral neuropathy in plaintiff's right leg. *A.R.* 652. An MRI of plaintiff's lower back showed a small disc bulge at one level and very mild disc bulge at another level. *A.R.* 654-55. September 2005 x-rays of the hips were normal. *A.R.* 640. An aortogram in October 2005 was normal. *A.R.* 598-99.

8

Dr. Brandt, plaintiff's treating family practitioner, completed a Multiple Impairment Questionnaire form on August 3, 2006. *A.R.* 628-35. Citing work-ups by prior cardiologists and pulmonologists and lab tests, Dr. Brandt diagnosed severe arteriosclerotic vascular disease, sleep apnea, hypertension, coronary artery disease, hyperlipidemia, chronic obstructive lung disease, major depression, peripheral neuropathy and morbid obesity. *A.R.* 628. Plaintiff's primary symptoms were chronic and continuous bilateral leg pain, shortness of breath on exertion, insomnia, and right hip pain. *Id.* Her pain and fatigue were characterized as moderately severe. *A.R.* 630. According to Dr. Brandt, plaintiff's prognosis was poor. Dr. Brandt opined that plaintiff is able to sit a total of 4 hours but would need to get up and move around every 30-40 minutes. *A.R.* 628. She could stand or walk a total of less than 1 hour in an eight hour workday. *A.R.* 630. Dr. Brandt noted an "INABILITY TO FUNCTION without several daily rest periods" because of sleep apnea. *Id.* [emphasis in original]. She would also need eight to twelve unscheduled 10 to 15 minute breaks over the course of an 8-hour workday. *A.R.* 633. He estimated that plaintiff would be absent from work, on average, more than three times per month. *A.R.* 634. Plaintiff would also need to avoid noise, fumes, gases, temperature extremes, humidity, dust, and heights; she could not push, pull, kneel or stoop. *Id.* Later that month, Dr. Brandt expressly opined that plaintiff is "permanently disabled." *A.R.* 625-27.

A December 2006 arterial flow study showed normal results at rest with minimal arterial insufficiency after exercise in plaintiff's right leg, and normal results at rest with moderately severe arterial insufficiency after exercise in plaintiff's left leg. *A.R.* 673-74. A repeat study conducted in June 2007 was normal for rest and moderately severe after exercise in plaintiff's right leg, with mild arterial insufficiency at rest with significant

9

arterial insufficiency after exercise in plaintiff's left leg. *A.R. 686-87*. An MRI of the left hip conducted in June 2007 was "essentially unremarkable." *A.R. 751-52*.

On July 5, 2007, Dr. Brandt reported that plaintiff suffered from chronic leg pain, increased hip pain, shortness of breath on exertion, pain in her left shoulder and dizziness when tilting her head back. *A.R. 693*. He also reported that plaintiff's obesity and depression increased her pain, and that any lifting caused pain. *A.R. 694*. According to Dr. Brandt, plaintiff could sit for two hours in a workday, but for only 30 minutes at a time. *Id.* Plaintiff could stand or walk for one hour in a workday, *Id.*, but would have to rest every forty minutes for roughly fifteen minutes at time. *A.R. 697*. Plaintiff could occasionally lift ten pounds, but she had marked limitations in the use of her left arm for grasping and reaching, and minimal limitations for fine manipulation. *A.R. 695-96*. She had moderate limitations in the use of her right arm for grasping and reaching, with minimal limitations for fine manipulation. *A.R. 696*.

That same month, Dr. Brandt reported that plaintiff could not walk more than two blocks at a time, could not stand for longer than thirty minutes, could not lift more than ten pounds occasionally; she could not "exert herself to any great extent." *A.R. 689-91*. Although she could perform activities of daily living, "her psychological well being is significantly impaired." *A.R. 690*. Dr. Brandt based these opinions on diagnoses of severe arteriosclerotic vascular disease, peripheral neuropathy, coronary artery disease, hypertension, high cholesterol, morbid obesity, sleep apnea, major depression with dysthymia, tobacco dependency, mixed connective tissue disease with myalgia and chronic obstructive pulmonary disease. *A.R. 689*. He emphasized that plaintiff was not "capable of gainful employment," could not "pursue gainful employment" and was "permanently disabled."

Although Dr. Brandt had treated plaintiff only since 2004, he stated that she had been "disabled since 1991." *A.R.* 690-91.

In September 2007, plaintiff reported to Dr. Gandhi, her sleep specialist, that she had no problems with daytime tiredness or sleepiness with use of her CPAP machine. *A.R.* 758. Dr. Gandhi noted a normal gait and diagnosed mild obstructive sleep apnea with "nice clinical response to nasal CPAP." *A.R.* 758.

In October 2007, Dr. Srivastava, plaintiff's treating cardiologist, indicated that plaintiff was "doing very well from the cardiac point of view." *A.R.* 759.

Dr. Danopulos, who had performed a Doppler study for the state agency in December 2004, consultatively examined plaintiff at the request of the state agency in March 2008. *A.R.* 706-25. According to Dr. Danopulos, plaintiff moved around the examining room without difficulty, had a normal gait, normal range of motion in her limbs, normal strength and was able to squat without difficulty. *A.R.* 709-11. There was no evidence of peripheral neuropathy. *A.R.* 710. Dr. Danopulos diagnosed a history of intermittent claudication, left chest neuralgias, a minimally arthritic low back, hip arthralgias, well-controlled blood pressure, obesity, early emphysema and circumstantial depression. *A.R.* 712. He opined that plaintiff could lift twenty pounds occasionally and ten pounds frequently, could sit for seven hours in an 8-hour workday, for one hour at a time, could stand for one hour out of eight, for fifteen minutes at a time, and could walk for ten minutes at a time. *A.R.* 718-19. Plaintiff could frequently reach and push/pull with her right arm and occasionally with her left arm. *A.R.* 720. Plaintiff could use her right arm to handle, finger and feel continuously, but could only frequently handle and finger with her left arm (although plaintiff could feel continuously with the left arm). *A.R.* 720. Dr. Danopulos further opined that plaintiff could use foot controls frequently with her

11

right leg and occasionally with her left leg. *A.R.* 720. She could continuously balance, occasionally climb, stoop and kneel but could never crouch or crawl. *A.R.* 721. Plaintiff could never work around temperature extremes, could only occasionally work at heights, with machinery and around respiratory irritants but could frequently work around humidity and vibrations. *A.R.* 722.

In April 2008, Barry McCorkle, M.D., who had replaced Dr. Brandt as plaintiff's primary care provider, completed a Multiple Impairment Questionnaire form similar to that completed by Dr. Brandt. *A.R.* 726-733. Dr. McCorkle noted no improvement in plaintiff's condition since the time that Dr. Brandt completed his questionnaire. *Id.*

### III.

### Administrative Decision

In his decision, the administrative law judge found that plaintiff's severe impairments consist of peripheral vascular disease, asthma, obesity and a history of coronary artery disease with associated hyperlipidemia. *A.R.* 23. The administrative law judge went on to find that plaintiff does not have an impairment or combination of impairments that meet or medically equal any listed impairment. *Id.* The administrative law judge next found that plaintiff retains the residual functional capacity to perform a reduced range of sedentary work. *Id.* Specifically, plaintiff would be restricted to lifting 10 pounds and must be permitted to alternate periods of sitting and standing at 30-minute intervals and to use a cane on a part-time basis when ambulating.[3] *Id.* Plaintiff would also be restricted to only occasional stooping, kneeling, climbing stairs and operating foot controls with her lower-extremities and would be precluded from crawling, crouching, working on uneven surfaces, performing work above shoulder level

---

[3]The administrative law judge noted that plaintiff did not bring a cane to the administrative hearing. *A.R.* 23.

with her left upper extremity and climbing ladders, ropes, or scaffolds. Plaintiff would also be restricted to only occasional exposure to pulmonary irritants and would be precluded from working in environments presenting hazards, temperature extremes or excess humidity. *Id.*

In considering plaintiff's subjective complaints, the administrative law judge found that, although plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. *A.R.* 28. Relying on the vocational expert's testimony, the administrative law judge found that, although plaintiff's residual functional capacity precluded the performance of her prior relevant work, she is nevertheless able to perform other work that exists in significant numbers in the national economy. *A.R.* 29. Accordingly, the administrative law judge concluded that plaintiff is not disabled within the meaning of the Social Security Act. *A.R.* 30.

## IV.

## DISCUSSION

Pursuant to 42 U.S.C. §405(g), judicial review of the Commissioner's decision is limited to determining whether the findings of the administrative law judge are supported by substantial evidence and employed the proper legal standards. *Richardson v. Perales*, 402 U.S. 389 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001); *Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). This Court does not try the case *de novo*, nor does it resolve conflicts in the evidence or questions of credibility. *See Brainard v. Secretary of Health &*

*Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, this Court must examine the administrative record as a whole. *Kirk*, 667 F.2d at 536. If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if this Court would decide the matter differently, *see Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *Longworth v. Comm'r Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005).

In her *Statement of Errors*, plaintiff contends that the administrative law judge erred by rejecting the opinions of her treating physicians, Drs. Brandt and McCorkle, and by basing his residual functional capacity findings on the opinions of the state agency reviewing physicians, the treating cardiologist Dr. Fallahnejad and the examining physician Dr. Danopulos. Plaintiff also challenges the administrative law judge's credibility determination.

1. **Evaluation of Medical Source Opinions**

To be afforded controlling weight, the opinion of a treating physician must be well-supported by medically acceptable clinical and laboratory diagnostic techniques, and must not be inconsistent with other substantial evidence in the record. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 242 (6th Cir. 2007); 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). In weighing the opinions of the treating physicians, an administrative law judge is required to consider such factors as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence, and its consistency with the record as a whole. 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2) - (6); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th

Cir. 2004). Even where the administrative law judge declines to accord controlling weight to the opinion of a treating physician, the administrative law judge "must still determine how much weight is appropriate. . . ." *Blakley v. Commissioner of Social Security,* 581 F.3d 399, 406 (6th Cir. 2009). Moreover, an administrative law judge must provide "good reasons" for discounting the opinion of a treating physician, *i.e.,* "reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, at 242, citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5.

Review of the administrative law judge's decision reveals a well-supported description of the medical records and medical source opinions in this case. *A.R.* 23-26. Contrary to plaintiff's contention, the administrative law judge provided sufficient information to show that he weighed these medical source opinions in the manner required by case law and the Commissioner's regulations.

It is true that the administrative law judge declined to credit the opinions of plaintiff's treating family practitioners, Drs. Brandt and McCorkle. He did so, however, based on factors permitted by the regulations. For example, the administrative law judge noted that plaintiff's alleged disabling conditions have been treated by specialists and not by Drs. Brandt or McCorkle. The administrative law judge also noted that Dr. Brandt's opinion of disability and extreme limitation in her ability to engage in work-related activities was at odds with his statement that plaintiff could perform her activities of daily living. *A.R.* 27. The administrative law judge also commented that "Dr. Brandt appears to have based his assessment upon the claimant's 'self-report' of symptoms without any critical evaluation of whether the claimant's complaints are supported by the evidentiary record." *Id*. It is also

15

significant that the administrative law judge relied on the records and the opinions of plaintiff's treating thoracic surgeon, Dr. Fallahnejad. *A.R.* 373-90. Dr. Fallahnejad's treatment notes from 2001 to 2003 indicate that plaintiff is capable of at least sedentary exertion. *Id.* Moreover, Dr. Danopulos, who consultatively examined plaintiff in March 2008, concluded that plaintiff is capable of light exertion, and the state agency physicians concluded that plaintiff could perform at least sedentary exertion. *See* A.R. 403-09, 566-72. Those medical source opinions constitute substantial support for the administrative law judge's residual functional capacity assessment. 20 C.F.R. §404.1527(d), (f)(2)(I). *A.R.* 23. Finally, and as the administrative law judge noted, Dr. Brandt's opinions that plaintiff is "disabled" are not entitled to any special deference. *A.R.* 27. *See* 20 C.F.R. §§404.1527(e)(1), 416.927(e)(1).

Although plaintiff challenges the administrative law judge's reliance on the residual functional capacity assessments of the state agency physicians, she does so mainly on the basis that those physicians had not reviewed the later reports and opinions of Drs. Brandt and McCorkle. Yet the administrative law judge found that their opinions were well supported by objective clinical evidence. *See A.R.* 23-24. In addition, because the administrative law judge did not err by rejecting the opinions of Drs. Brandt and McCorkle (for the above-stated reasons), it was not error for the administrative law judge to credit the opinions of the state agency physicians under these circumstances.

This Court concludes that the administrative law judge did not err in failing to accord controlling or even great weight to the residual functional capacity assessments articulated by Drs. Brandt and McCorkle.

2. **The Administrative Law Judge's Credibility Findings**

Plaintiff also contends that the administrative law judge erred in his assessment of her credibility and subjective complaints of pain. In this regard, plaintiff argues that, in discounting her credibility and subjective complaints, the administrative law judge improperly based his findings on only plaintiff's daily activities. Plaintiff further argues that the administrative law judge failed to consider any of the other factors required by Social Security Ruling ["SSR"] 96-7p when evaluating plaintiff's credibility.

An administrative law judge's findings concerning the credibility of a claimant's testimony about her pain or other symptoms "are to be accorded great weight and deference, particularly since an administrative law judge is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). "Nevertheless, an administrative law judge's assessment of a claimant's credibility must be supported by substantial evidence." *Id.* The Commissioner, speaking through the Rulings, mandates in part:

> The reasons for the credibility finding must be grounded in evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator to simply recite the factors that are described in the regulations for evaluating symptoms. The determination must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186.

In the case presently before the Court, the administrative law judge did not err in his analysis of the

17

evidence relating to plaintiff's allegations of disabling pain. First, the administrative law judge set forth the correct legal standard for determining plaintiff's credibility. *See A.R.* 27-28. Next, the administrative law judge did not base his findings in this regard merely upon plaintiff's daily activities.  The administrative law judge analyzed plaintiff's credibility and subjective reports of pain as follows:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below. An assessment of all relevant factors does not establish that the claimant is limited to the extent that she is "disabled" within the meaning of the Social Security Act. Her daily activities and levels of functioning in the performance of routine daily tasks is more consistent with an ability to function in a competitive work environment performing job duties at the sedentary level of exertion with the additional functional restrictions set forth above. The claimant has a valid driver's license and is able to drive whenever necessary. She is able to care for all of her own personal needs and can perform some basic household chores such as cooking food in the microwave, doing laundry and shopping at the grocery and Target. She is visited in her home by relatives, talks on-line with others, and enjoys going to the movies. She walks for exercise. On a typical day, the claimant rises at 8:00 AM, takes medications, eats breakfast, and goes back to sleep on her couch. She later takes additional medications, sends e-mails, has dinner, and watches television. While the claimant attempted to portray herself as leading a somewhat-sedentary existence when she testified at the hearing, such lifestyle must be considered a matter of choice, not the result of her impairments. Considering all of the evidence, it is found that her allegations lack credibility to the extent that they purport to establish a condition of disability within the meaning of the Social Security Act and Regulations.

>The claimant's residual functional capacity for a reduced range of sedentary work also takes into consideration the location, duration, frequency, and intensity of the claimant's alleged symptoms, as well as precipitating and aggravating factors. The claimant has undergone coronary artery bypass surgery as well as several invasive angioplasty and stenting procedures. However, she tolerated each of these procedures well, and her remaining treatments have necessitated only periodic, conservative measures which are by no means indicative of total disability. She does take some prescription medications. She complained of drowsiness and dizziness as side effects of these medications. However, these allegations are not supported by the medical record, and there is no evidence that she experiences any side effects from her medications or treatments which would prevent her from working.
>
>The claimant also alleges that she has severe lower extremity swelling and that she must spend much of her time sitting in a recliner. A necessity to elevate her feet – while admittedly helpful – for a significant time period throughout the day is not shown by the medical record. More specifically, there is no evidence that the claimant is medically required to elevate her feet with such a frequency so as to be work-preclusive. These allegations are also not supported by the record. Whatever difficulty the claimant may have remaining on her feet for extended periods is adequately addressed and accommodated by the sit/stand option at 3-minute intervals which I have imposed, and there is no basis for any further restriction permitting the claimant to elevate her feet for a specific portion of each day. The claimant also alleges that she sleeps for 12-15 hours per day, but, again, there is no evidence in the medical record which indicates that this is the result of medication side effects, the claimant's alleged sleep apnea difficulty or any other medical condition. Nor can I consider the claimant's complaints of dyspnea to be fully credible when she only recently quit smoking. All in all, the above described residual functional capacity assessment for a reduced range of sedentary work is consistent with the testimony and specific diagnoses of the treating and examining sources. Therefore, the claimant's allegations of total disability are found to be disproportionate and less than credible.

*A.R.* 28-29.

Under these circumstances, the administrative law judge's credibility determination enjoys substantial support in the record.

It is therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED** and that this action be **DISMISSED**.

If any party seeks review by the District Judge of this *Report and Recommendation,* that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation,* specifically designating this *Report and Recommendation,* and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1); F.R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy thereof. F.R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *Smith v. Detroit Federation of Teachers, Local 231 etc.,* 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

Date: August 11, 2011                    *s/Norah McCann King*
                                         Norah McCann King
                                         United States Magistrate Judge